(Decided 29th June, 1870.)

---

## State of Maryland *vs.* The National Bank of Baltimore.

*Bank chartered by the State changed to a National Bank—Right of the State to exact a bonus or tax.*

The Bank of Baltimore was chartered by Act of Assembly, 1853, ch. 441. By the 5th section of that Act, the Bank was required to pay to the State on the first Monday of each January, 20 cents on every $100 of the capital stock paid in during the year preceding. In July, 1865, it surrendered its charter to the State, and organized as a National Association under the 44th section of the Act of Congress, 1864, ch. 106. The Act of Assembly of 1865, ch. 144, authorized State Banks to reorganize under the Act of Congress, provided all sums required by their charters "to be paid to the State continue to be paid as heretofore." On a suit for the dues of the Bank of Baltimore under the Act of 1853, ch. 441, sec. 5, accruing after its conversion into a National Bank, HELD:

1st. That the Bank had a right to surrender its charter to the State, as provided in the 17th section of the Act of 1853, ch. 441.

2d. That the bonus imposed by the 5th section of the Act of 1853, ch 441, was a price paid for the right of exercising the powers, and enjoying the immunities conferred by the charter, and after its surrender the State had no right to exact the bonus.

3d. That after the reörganization of the Bank as a National Association the bonus could only be exacted as a tax, which the State had no authority to impose

APPEAL from the Superior Court of Baltimore City.

This suit was instituted by the appellant in accordance with the requirements of Resolution No. 4, of the General Assembly of Maryland of 1868, to recover certain sums of money claimed to be due and payable by the appellee, under the Acts of Assembly of 1853, ch. 441, and 1865, ch. 144, for the augmentation of the Free School Fund of the State.

The cause was argued before BARTOL, C. J., STEWART, MAULSBY and ALVEY, J.

*Attorney General Jones,* for the appellant.

The plaintiff's first prayer should have been granted. It involves the proposition, that if the facts stated be found to be true, the legal result was a contract between the State and the appellee, whereby the latter became bound to pay the sum stated in the prayer.

The 5th section of 1853, ch. 441, expressly stipulates for such payment. The 10th section proposed to continue the existence of the corporation on the condition of the assent to and adoption of the Act, by a majority of the stockholders—which was given as required. By the 17th section provision was made for closing its banking operations and dividing its assets and property amongst the stockholders.

It thus appears that terms were proposed by the State and accepted by the Corporation, and a contract in law was the result. *Gordon's Exs. vs. Mayor, &c., of Baltimore,* 5 *Gill,* 231; *Same vs. Same,* 3 *Howard,* 133.

State *vs*. The National Bank of Baltimore.

If a charter is voluntarily accepted, the Corporation is bound by all it contains. *Bushwick vs. Ebbets*, 3 *Edw.*, 353.

A charter must be accepted or rejected by the corporate body in *toto*, otherwise a corporation might reject the obligation imposed, and accept the benefit conferred upon them. *Rex vs. Westwood*, 2 *Dow & C.*, 21.

The legal effect of the Act of 1865, ch. 144, was to substitute the provisions of the Act of Congress "To Provide a National Currency," &c., for the charter granted by Maryland in 1853; and to propose to the said Corporation this substitute, *with the additional powers and conditions contained in the Maryland Act*, for its acceptance or rejection, as its interest might prompt. It is not denied that the Bank might have utterly rejected the Maryland Act of 1865, ch. 144, and have closed its banking business and distributed its assets under sec. 17, of 1853, ch. 441; and then, that such of its stockholders as desired might, as individuals, have associated themselves into a banking association under the Act of Congress. But in no other way, without the assent of the State, could it have escaped from its liability to the State under its alleged contract in accepting the Act of 1853, ch. 441.

*I. Nevett Steele*, for the appellee.

The provision in the 3d section of the Act of Assembly of 1865, ch. 144, in the following words: "provided, that the existing laws of the State providing for taxes on the State Banks for purposes enumerated therein, shall extend and apply to all State banks and other institutions availing themselves of the provisions of this Act, when they shall have become banking associations under the Act of Congress; and all sums required by the charters of said institutions and banks to be paid to the State, shall continue as heretofore to be paid," is in so far as it seeks to impose on the appellee the tax or bonus of twenty cents on every hundred dollars of its capital stock actually paid in, as provided by the Act of the General Assembly of Maryland of 1853, ch. 441, sec. 5, inconsistent with

and not authorized by the 41st section of the Act of Congress of 1864, ch. 106.

It has been settled by the Supreme Court of the United States, that Congress has the constitutional power to incorporate a bank, and that the States have no power to tax a bank so incorporated.· If, therefore, the Act of Congress of 1864 had contained no special provision in reference to the taxation of banking associations by the States, it is clear that such an association, established and existing under that Act, would have been exempt from State taxation. The object of that Act was to provide a currency for the whole country ; and the banking associations which it authorized, were not only a necessary means to accomplish that object, but.were also to be depositories of the public moneys, and financial agents of the ·Government. The power on the part of the States to tax their capital, would include the power to destroy them, if the States so wished, and is clearly prohibited, according to the decision of the Supreme Court in the case of *McCulloch vs. The State of Maryland*, 4 *Wheat.*, 316.

But the Act of Congress in its 41st section does provide specially for taxation by the States. That section enacts that "in lieu of all existing taxes, every association shall pay to the Treasurer of the United States," certain duties or taxes, and then goes on to provide, "that nothing in this Act shall be construed to prevent *all the shares* in any of the said associations, held by any person or corporation, from being included in the valuation of the personal property of such person or corporation, in the assessment of taxes imposed by or under State authority," but not at a greater rate than is assessed on other moneyed capital, in the hands of individual citizens, nor at a rate to exceed that .imposed on the shares of any State banks, and " that nothing in this Act shall exempt the real estate of associations from either State, county or municipal taxes, to the same extent, according to its value, as other real estate is taxed." The authority to tax given by this section and the limitations which accompany it, being part of an Act

of Congress passed, (to use the language of the Supreme Court,) "in the exercise of undoubted constitutional powers," are, under the Constitution of the United States "the supreme law of the land," and all State legislation inconsistent with them, is void and of no effect. The school tax imposed by the Act of Assembly of 1853, and continued by the Act of 1865, instead of being a tax upon *shares of stock* at their assessed valuation in the hands of their owners, is a *special* tax to be paid by the bank on *its capital paid* in, and is not only inconsistent with the 41st section of the National Currency Act, but in direct and obvious violation of its language and spirit.

The Currency Act, by its 44th section, provides that any State bank may, "by *authority of this Act,* become a National association under its provisions," &c., and "shall have the same powers and privileges, and shall be subject to the same duties, responsibilities and rules, in all respects, as are prescribed in this Act for other associations organized under it, and shall be held and regarded as an association under this Act." This provision does not depend upon State legislation to give it effect and operation, and therefore the Act of Assembly of 1865, ch. 144, was not necessary to enable State banks to become National associations. It was unnecessary in reference to the Bank of Baltimore for the further reason, that by the 17th section of the Renewal Act of 1853, ch. 441, it had the power, by the action of its President and Directors, or of a majority of its stockholders, to close its banking business and finally abandon its banking powers and privileges, and having done this, it would of course have been competent for its officers and stockholders to organize themselves as a National banking association. *Act of Congress,* 1864, (*Public, No.* 85); *Act of Assembly,* 1853, *ch.* 441; *Act of Assembly,* 1865, *ch.* 144; *Act of Assembly,* 1868, *ch.* 239; *McCulloch vs. State of Maryland,* 4 *Wheaton,* 316; *Osborne vs. Bank of United States,* 9 *Wheaton,* 738; *Weston vs. City of Charleston,* 2 *Peters,* 449; *Howell vs. State,* 3 *Gill,* 14; *Van Allen vs. The Assessors,* 3 *Wallace,* 573, 581; *People vs. The Commissioners,*

4 *Wallace,* 244; *Veazie Bank vs. Fenno,* 8 *Wallace,* 533, 549; *Opinion of Attorney General of Maryland in "Senate Journal and Documents,"* 1865.

If the last clause of the 3d section of the Act of 1865, ch. 144, is unconstitutional, it follows, that the prayers of the appellant were properly rejected. They both rest upon the hypothesis of a contract, express or implied, between the State and the bank, by which the latter continued to be liable to the payment of the school tax after it became a National association. Neither the stockholders of the State bank nor the new banking association itself, could validly make such a contract. The limitations as to State taxation prescribed by the National Currency Act were not intended merely for the benefit of the shareholders of the banking associations, but for the benefit of the country and the government, by protecting the associations from burthens which might prevent them from successfully effecting the public objects and discharging the public duties for which they were created. Therefore, neither the stockholders, before organization, nor the bank, afterwards, could waive their limitations. Nor could the State, by legislative contract, that is, by legislation to be subsequently assented to by the bank, do that which by the Constitution of the United States and a law made in pursuance thereof, it was prohibited from doing. If the stockholders had supposed that they were bound by any such contract with the State, it would have been a fraud upon the United States Government for them to have reported to the Comptroller of the Currency that they had organized themselves under and in accordance with the United States Statute of 1864, when in reality they had contracted to pay a tax which that law prohibited.

MAULSBY, J., delivered the opinion of the Court.

The Act of 1853, chapter 441 re-chartered several of the banks of this State whose charters were about to expire, and amongst others, the Bank of Baltimore, since converted into

a National Association under the Act of Congress of 1864, chapter 106.

The 5th section of the Act of 1853, provided that each of the banks should annually pay to the Treasurer of the State of Maryland, on the first Monday of January, the sum of twenty cents on every hundred dollars of the capital stock actually paid in, to be applied in augmentation of the Free School fund, and that if any of said banks failed to make said payment, within six months after it became payable, its charter should be forfeited, and be deemed null and void.

The 17th section did not provide a mode in which the banks, or any of them, should evidence a determination to close banking operations, or a particular means by which said operations should be closed, and the assets distributed, as seemed to be supposed in the argument of the Attorney General; but provided simply, that if the President and Directors, or a majority of the stockholders in general meeting assembled, should, *at any time*, determine to close the banking operations of any of said banks, it should not be lawful for such corporation *thereafter,* to resume the exercise of its banking powers and franchises.

There is no provision of the Act of 1853, restraining any of the banks incorporated by it from ceasing to exercise the powers and franchises conferred by it, at any time when the President and Directors, or a majority of the stockholders might so determine. On the contrary, the 17th section expressly recognizes the right to do so, at any time during the corporate existence authorized by the Act.

The Bank of Baltimore availed of the rights and franchises granted, and assumed the obligation to pay twenty cents on every hundred dollars of its capital stock paid in annually, so long as it should continue its existence under the authority of the Act. The franchise granted was to conduct banking operations. All other provisions of the Act were incident to the exercise of this franchise. The right of "closing its banking operations" necessarily pertained to the corporation,

from the nature of its being, and, as stated, was recognized by the 17th section.

The bank was in existence under the authority of the Act of Assembly of 1853, when the Act of Congress of 1864 was passed. The latter Act was passed "to provide a National currency, secured by a pledge of United States bonds, and to provide for the redemption and circulation thereof." It proposed to effect this by means of authorizing associations to be organized "for carrying on the business of banking." The 5th and following sections, to 43d inclusive, provided in detail for the means and the manner in which they were to be applied. The 44th section provided, "that any bank, incorporated by special law, or any banking institution organized under a general law of any State, may, by authority of this Act, become a National association under its provisions," and proceeded to detail the manner in which a banking institution might become organized as a National association, as in the preceding sections the manner had been detailed in which persons might organize for the same purpose.

The power of Congress to pass the Act of 1864, is not made a question in this case, which is against a defendant existing under its authority, and we are, therefore, relieved of the duty of expressing an opinion on that subject. In this opinion, we must assume the constitutionality of all those parts of the Act of 1864 which are necessarily involved in the decision of the case before us. It provided full and perfect means by which to enable the Bank of Baltimore to become changed and converted into a National association.

The record shows that, on the 13th of July, 1865, the owners of the capital stock of the Bank of Baltimore organized an association under the Act of Congress, and determined to conduct their business, from and after the first day of August, under the title of the National Bank of Baltimore, and that on the 17th day of July the Governor of the State, by his proclamation, announced that the charter of the Bank of Baltimore, as granted by the General Assembly, had

been surrendered, and that its corporate powers, under said charter, would thenceforth cease.

The charter being surrendered and annulled, on what ground can the State demand the price which was payable whilst the charter continued, for the privileges granted by it?

" The bonus imposed by the charter of banks, is not a tax on the franchises granted, but a price to be paid for the right of exercising the powers, and enjoying the immunities conferred by the charters." 6 *Gill*, 288.

This suit is against the National Bank of Baltimore, to recover the bonus imposed by the Act of 1853, on the Bank of Baltimore, which has accrued and become payable, as alleged, since the change and conversion of the Bank of Baltimore into The National Bank of Baltimore.

The right to recover is not, and could not be maintained on the ground that the State is entitled to the price to be paid by the Bank of Baltimore for the right of exercising the powers and enjoying the immunities conferred by its charter. That has been surrendered and annulled. The right to recover is vested on the ground of contract, and it is contended that, by the Act of Assembly of Maryland, of 1865, chapter 144, the Bank of Baltimore was *enabled* to abandon its charter, and avail of the provisions of the Act of Congress, and to continue " to use its corporate name for the purpose of prosecuting and defending suits instituted by or against it, and of enabling it to close up its affairs," and to have all its assets, real and personal, vested in the association organized under the Act of Congress, without other transfer, on condition " that the existing laws of the State providing for taxes on the State banks, for the purposes enumerated therein, shall extend and apply to all State banks and other institutions, availing themselves of the provisions of this Act, when they shall have become banking institutions under the Act of Congress, and all sums required by the charter of said institutions and banks to be paid to the State, shall continue as heretofore to be paid."

The money sued for was payable to the State under the Act of 1853, as a price for the right of exercising the powers and enjoying the immunities of the State charter. When that charter was surrendered and annulled, the money could no longer be payable for that right. If the duty of continuing to pay it could be imposed on the new association created by the Act of Congress, and existing under its authority, it could only be by virtue of power in the State to impose it as a tax. It is clear that it could be demanded only as payment for a right granted by the State, or as a tax imposed by the State. It is clear that the State had no power to impose it as a tax.

In *McCulloch vs. The State of Maryland*, 4 *Wheaton*, 316, the Supreme Court said: " The State governments have no right to tax any of the constitutional means employed by the Government of the Union to execute its constitutional powers," and " the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner, control the operations of the constitutional laws enacted by Congress to carry into effect the powers vested in the National Government."

And in *Howell vs. State*, 3 *Gill*, 14, our own Court of Appeals said: " State sovereignty extends to everything which exists by its own authority, or is introduced by its permission, but not to those means employed by Congress to carry into execution powers conferred by the Constitution of the United States."

The prayers of the plaintiff below rested on the ground of contract, and were addressed to the point, that it ought to be left to the jury, on all the facts and circumstances of the case, to find an implied agreement by the defendant, to pay the money sued for. It could not be competent to the jury to find an implied contract by the defendant to pay to the State a bonus for the privileges and franchises of defendant's charter. No charter from the State was in existence. The defendant derived the franchises and privileges which it enjoyed

from the Act of Congress. It would have been contrary to law for the jury to so find. So, it could not be competent for the jury to infer a promise by defendant to pay to the State a tax which the State had no right to demand. The attempt by the State to impose such a tax would be void, and there could be incumbent on the defendant no duty to pay it, on which a promise to pay could be raised by implication. In no view do we think that the jury could have been justified in finding a contract by the defendant on which the action could have been maintained, and we, therefore, concur with the Court below in the propriety of rejecting the appellant's prayers.

*Judgment affirmed.*

(Decided 27th June, 1870.)

